IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HALIOTIS INVESTMENTS S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| ARCH HILL CAPITAL N.V., LITHIUM | ) | |
| TECHNOLOGY CORP., HENDRIKUS | ) | |
| HAROLD van ANDEL, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Haliotis Investments S.A. ("Haliotis"), by its undersigned attorneys, for its

Complaint against defendants Arch Hill Capital N.V. ("Arch Hill"), Lithium Technology Corp.

("LTC"), Hendrikus Harold Van Andel ("Van Andel," and collectively with Arch Hill and LTC

"Defendants"), alleges the following upon information and belief, except as to those allegations

concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and

belief are based upon, among other things, its investigation of publicly available SEC filings

from 2002 through the present, press releases, public statements and reports, articles and

discussion concerning LTC or Arch Hill and the subject matter of this Complaint.

## NATURE OF ACTION

1.    This dispute arises out of a scheme, by and among Defendants, to circumvent the

anti-fraud provisions of the United States securities laws.  This scheme sought to—and did—

raise money for LTC, a publicly traded Delaware company, covertly through transactions run

through Arch Hill, a Netherlands Company, that relied on false pretenses, misrepresentations,

and violations of trust and applicable legal duties.  In these transactions, Defendants Arch Hill

and Van Andel acted as an underground conduit of funding from Plaintiff Haliotis to Defendant LTC.

2.      The success of the wrongful scheme depended on Arch Hill's ability both to extol LTC's status as a publicly traded Delaware company whose securities were freely traded, liquid investments and to exploit the long-existing relationship of trust and confidence between Plaintiff Haliotis and Defendants Arch Hill and Van Andel.

3.      Defendants preyed on this trust to defraud Haliotis out of millions of dollars by promising to convey unrestricted LTC common stock, which Defendants simply lacked the ability or inclination to convey.

4.      Defendants were able to conceal the extent of their fraudulent scheme and to prevent its detection by making oral misrepresentations to Plaintiff and through false and misleading filings made with the SEC.

## JURISDICTION AND VENUE

5.      This action arises under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j (b), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. 240. Jurisdiction is based upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

6.      Venue is proper in this District under Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and pursuant to 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b).  LTC is a Delaware corporation.

7.      In connection with the acts and conduct complained of, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities exchanges.

8.    This Court may properly exercise subject matter jurisdiction over Plaintiff's claims, as the gravamen of the alleged scheme was an effort to skirt U.S. securities laws and to sell unregistered LTC securities.  The scheme had a direct impact on the market for those securities in the U.S.  Indeed, the entire objective of the deceptive transaction between Haliotis and Arch Hill was to raise money and restructure the balance sheet for LTC, whose common stock is traded on the NASDAQ marketplace, through an offshore transaction by Arch Hill, a company operating outside of the consistent scrutiny of U.S. regulators.  Further, subject matter jurisdiction is appropriate where, as here, an exercise of jurisdiction is required to ensure that the United States does not become the base for fraudulent activity.

## THE PARTIES

9.    Plaintiff Haliotis is a company organized pursuant to the laws of Luxembourg. Haliotis is a holding and investment company which is beneficially owned by Mr. Arie de Reus ("De Reus"), a resident of Belgium.

10.    Defendant LTC is a Delaware corporation whose common stock is publicly traded on the NASDAQ marketplace and is subject to United States securities laws.  LTC maintains its corporate headquarters in Plymouth Meeting, Pennsylvania.  LTC is a global provider of power solutions for diverse applications.

11.    Defendant Arch Hill is a company organized pursuant to the laws of the Netherlands.  Arch Hill is engaged in venture capital investment, investing in other entities both directly and indirectly.  Arch Hill has owned a controlling interest in LTC since approximately October 2002.  At all times relevant to this action, Arch Hill has exerted substantial control over LTC's business decisions, by virtue of its position as LTC's largest and controlling shareholder and as the holder of the power to select the majority of LTC's Board of Directors.

12.    Defendant Van Andel is a natural person and citizen of the United Kingdom. Van Andel is currently the Chairman of LTC and has been an LTC director since November 26, 2002. Van Andel has been Arch Hill's CEO since 1988. Van Andel frequently makes public statements in, and to, the United States securities markets, including in LTC's publicly filed documents.

## FACTUAL ALLEGATIONS

### A.    Background of the Parties' Relationship.

13.    In December 2001, Arch Hill agreed to advance funds to LTC for working capital purposes. LTC issued promissory notes to Arch Hill that were convertible into shares of LTC common stock. Their financing agreement also provided Arch Hill with the right to appoint half of the members of LTC's board of directors.

14.    Arch Hill subsequently filed a Schedule 13D reporting this transaction, which was signed and certified by Van Andel.

15.    After establishing their initial relationship, LTC and Arch Hill entered into various additional financing agreements during 2002, through which Arch Hill provided money to LTC via various complicated transactions or share exchanges between LTC and either Arch Hill directly or one of its related or wholly owned affiliates. In return, LTC issued additional convertible LTC securities to Arch Hill.

16.    For example, in March and June of 2002, Arch Hill loaned LTC funds in exchange for notes convertible into, respectively, 9,525,312 shares and 7,406,775 shares of LTC common stock.

17.    In March and June 2002, Arch Hill filed Schedules 13D/A reporting these transactions, which were certified and signed by Van Andel.

18.    Transactions like these between LTC and Arch Hill continued through November 2002, at which point Arch Hill owned 27.1% of LTC's issued shares along with convertible instruments giving LTC control in the aggregate of approximately 70% of LTC's outstanding common stock.    Arch Hill's controlling stock position and contractual rights give Arch Hill control over LTC with an effective veto over all significant LTC corporate transactions.

19.    Because of the interrelationship between Arch Hill and LTC, LTC's future prospects were tied into Arch Hill's financial strength and Arch Hill's ability to continue financing LTC.

**B.    Defendants' Relationship With Haliotis.**

20.    Since at least 1998, Arch Hill has acted as a financial advisor to Haliotis.  During this time, Arch Hill and Van Andel identified, arranged, and managed a number of investments for Haliotis and De Reus.    Arch Hill and Van Andel frequently provided investment recommendations and advice to Haliotis and De Reus.  As a consequence, Haliotis and De Reus came to place a great deal of trust and confidence in Arch Hill and Van Andel and to rely on the truth of their representations.    In particular, De Reus relied on Van Andel to provide sound investment advice, including accurately representing the scope, nature, and level of risk associated with any potential investment.

21.    In 2001, on the advice of Arch Hill, Haliotis purchased shares in a special-purpose vehicle, Dome Arch Capital N.V. ("Dome Arch"), per Dutch notarial deed of share issue.  Haliotis paid €5,000,000 for 50 common shares, representing 98% of the capital in Dome Arch at the time of issue of those shares.  Arch Hill, being the incorporator of Dome Arch, held one common share registered in its name.  Haliotis' participation in Dome Arch was one of a number of transactions that Haliotis entered into and which Arch Hill promoted to its investors.

Haliotis was one of the larger investors that participated in ventures promoted by Arch Hill and Van Andel.

**C.**    **The Fraudulent Scheme: Haliotis/LTC Transaction.**

22.    From 1998-2001, at Arch Hill's suggestion, Haliotis and its affiliated Dutch limited liability company, AmstelOne B.V. provided approximately $400,000 in debt financing to the German limited liability company GAIA GmbH, which LTC acquired in 2002 through a share-exchange transaction.

23.    In late-spring 2003, LTC engaged H.C. Wainwright & Co. ("Wainwright") to attempt to raise capital through a private placement of LTC securities.    Wainwright is an American investment bank and NASD member located in New York City.

24.    On April 23, 2003, Arch Hill provided Haliotis with a term sheet (the "Term Sheet") prepared by Wainwright.  The Term Sheet is attached as Exhibit "A".  It proposed the issuance in two tranches of $12,000,000 in Series C Convertible Preferred LTC Stock and Warrants.  The Term Sheet contained provisions governing registration rights for subsequent transactions in LTC securities on U.S. markets.

25.    By providing the Term Sheet to Haliotis and De Reus, Arch Hill sought to pique their interest in purchasing LTC securities.  The Term Sheet had the desired effect, and Haliotis and De Reus in fact became interested in purchasing LTC securities in reliance on Van Andel and Arch Hill's representations.

26.    LTC ultimately chose not to raise money on the terms set forth in the Term Sheet. LTC instead conspired with Arch Hill and Van Andel to obtain the necessary funding through non-regulated and fraudulent means.

27.    In May 2003, Arch Hill, as LTC's majority shareholder, granted LTC's board of directors broad authority to effectuate a reverse stock split of LTC's common stock. This authority provided that the board—which Arch Hill controlled—could at any time before December 31, 2003 effectuate a reverse stock split using one of three different exchange ratios. Alternatively, the board could elect not to effect a reverse split at all. Accordingly, the decision of whether or not to effect a reverse split and at what ratio was within Arch Hill's control as of May 2003. The reverse split would allow Arch Hill—through LTC—to create the impression of a stronger market for LTC stock by increasing its price per share by ten, fifteen, or twenty times. The reverse split would also have the practical effect of allowing Arch Hill to quickly dilute the holdings of any significant LTC shareholder because Arch Hill could continue causing LTC to issue LTC common stock to Arch Hill following the reverse split in exchange for the various convertible LTC securities held only by Arch Hill or its affiliates. On information and belief, Arch Hill's ability to control and manipulate the ratio and/or timing of the reverse split was integral to Defendants' wrongful scheme.

28.    At approximately the same time as the reverse split was authorized, De Reus explained to Van Andel and others at Arch Hill that he wished to sell Haliotis's stake in Dome Arch because he was unhappy with its direction and management. In response, Arch Hill expressed its willingness to buy back Haliotis's shares in Dome Arch. Arch Hill and Van Andel then proposed that Haliotis use the proceeds of its sale of Dome Arch shares to Arch Hill to purchase LTC common stock from Arch Hill.

29.    To induce Haliotis to consummate the transaction, Arch Hill and Van Andel made numerous representations in June and July 2003 regarding LTC's position in the U.S. market, including that (i) Haliotis's investment in LTC would be highly liquid, (ii) that Daan Martin, a

Haliotis executive, would serve on LTC's board of directors if Haliotis purchased the LTC common stock, and (iii) that Arch Hill possessed at that time sufficient freely transferable shares of LTC common stock to effect the transaction.

30.     Each of these representations was material to Haliotis and designed by Arch Hill and Van Andel to address reservations that Haliotis had about the proposed transaction. First, following Haliotis' illiquid Dome Arch investment, the existence of a liquid market for LTC common stock was critically important to Haliotis's investment decision. Second, Haliotis wanted to be informed about the performance of its investment on an ongoing basis, which the offer of a board seat to Mr. Martin would provide. Finally, Arch Hill's ability to actually transfer the LTC shares it promised was a fundamental condition of the deal.

31.     In reliance on these representations, Haliotis agreed to exchange its interest in Dome Arch to Arch Hill for LTC shares and to pay an additional sum of €4,000,000 to Arch Hill in exchange for additional LTC shares.   Neither Arch Hill, nor Van Andel raised the possibility—much less the timing or exchange ratio—of an LTC reverse split or the subsequent and substantial dilution of Haliotis' investment.

32.     Because of their history of dealing, Haliotis and De Reus relied exclusively on Arch Hill and Van Andel for information regarding LTC and the proposed transaction and relied on the truth of their representations.

33.     On June 30, 2003, Chris Van den Berg ("Van den Berg") sent a facsimile, on behalf of the Management Board of Arch Hill, to Daan Martin seeking to make clear the "means" by which Haliotis would effectuate its transfer of funds and stock in Dome Arch to Arch Hill (the "June 30 fax").  A copy of the June 30 fax along with a true and correct translation is attached as Exhibit "B".  In the June 30 fax, Van den Berg acknowledged that De Reus was

proceeding with the transaction so that he could (1) take a more active or partnering role in Haliotis' investments with Arch Hill; and (2) strengthen the pre-existent "close ties" between De Reus, Van Andel, Haliotis, and Arch Hill.

34.    The June 30 fax further provides that in exchange for its interest in Dome Arch, "Haliotis will buy LTC shares" from Arch Hill.    The June 30 fax did not condition this transaction on any additional condition precedent.    The June 30 fax did not indicate in any way that Haliotis would—at the completion of the transaction—own anything other than a full and unencumbered right to possess and control the LTC securities it had purchased.    Rather, Van den Berg, on behalf of Arch Hill, indicated that the exchange of Haliotis' stock in Dome Arch plus an additional €5,000,000 for LTC stock was to be a direct exchange for freely-tradable, unencumbered LTC common stock.

35.    The June 30 fax did not mention the possibility of a reverse stock split or substantial dilution, nor did it raise either issue in any way.

36.    Van Andel and De Reus had subsequent negotiations, including a meeting on July 3, 2003 and a lengthy telephone conversation on July 5, 2003.    Based on these negotiations, and based on the prior representations made by Van Andel, Van den Berg, and others, De Reus and Haliotis reasonably believed that Haliotis was purchasing 85.5 million freely tradable registered shares of LTC common stock from Arch Hill, and that Daan Martin would become a non-executive member of LTC's board of directors.

37.    At no point during these negotiations did anyone from Arch Hill raise the issue of the potential of a reverse stock split, the prospect of substantial dilution or the fact that Arch Hill did not have 85.5 million freely tradable LTC shares to convey.

38.    On July 5, 2003, Arch Hill entered into an agreement for Haliotis's purchase of 85.5 million shares of LTC common stock. ("July 5 Agreement").    A copy of the July 5 Agreement along with a true and correct translation is attached as  Exhibit "C."    The July 5 Agreement provided that:

- In exchange for Haliotis's Dome Arch stock, Arch Hill would provide 47,500,000 LTC shares that would be purchased at a purchase price of $ 0.12 per share;

- Haliotis would make an additional payment of €4,000,000 to Arch Hill.  This amount was to be used for the purchase of 38,000,000 additional LTC shares for a purchase price of $ 0.12 per share;

- In total 85,500,000 shares would be transferred to Haliotis and,

- Daan Maartin would be appointed to LTC's board according to conditions acceptable to him.

Van Andel and De Reus both signed the July 5 Agreement.

39.    At the time of this transaction, LTC had 88.2 million shares outstanding.  Arch Hill owned approximately 23.1 million of these shares.  Haliotis was agreeing to acquire 85.5 million shares of LTC.  A clear premise of the transaction was that Haliotis would become a direct and substantial LTC shareholder.  As later became clear, however, neither Arch Hill, Van Andel, nor LTC had any intention of allowing this to happen.

40.    Consistent with Dutch practice, final deal documents were to be drafted by a neutral, independent civil notary.  The notary was also to act effectively as an escrow agent for the parties.  Under the terms of the agreed-to transaction, the notary would receive and hold the purchase consideration from Haliotis and the LTC shares from Arch Hill and would only release them upon performance by both parties.

41.    On July 9, 2003, O.W. De Jong, a civil notary with the Dutch law firm of Barents & Krans, sent a letter to Haliotis, Arch Hill, and various other Arch Hill-related entities (the "De

Jong letter"). A copy of the De Jong letter is attached as Exhibit "D." Mr. De Jong explained that he had been instructed by Arch Hill to prepare a number of notarial deeds to formalize the July 5 Agreement on the basis of the terms and conditions set forth in the July 5 Agreement.

42.    The De Jong letter sought to summarize and elaborate on the key elements of the July 5 Agreement, including that Haliotis would sell and transfer its 50 shares in the capital of Dome Arch to Arch Hill and pay Arch Hill additional cash consideration of €4,000,000 in exchange for the beneficial ownership of 85.5 million shares of LTC common stock. The De Jong letter further noted that the beneficial ownership of those shares would be held for the "risk and account of Haliotis" by an Arch Hill affiliate. The De Jong letter further stated that the Arch Hill affiliate had the ability to issue depository receipts "related to the common shares in LTC" to Haliotis. Daan Martin, as authorized representative of Haliotis and Van Andel, subsequently approved the letter. Van Andel signed both on behalf of Arch Hill and its affiliate.

43.    As a result of the De Jong letter, Haliotis reasonably believed that Arch Hill and Van Andel would transfer to Haliotis beneficial ownership of 85.5 million LTC shares.

44.    Contrary to Arch Hill's representations and unbeknownst to Haliotis, at the time of this transaction Arch Hill did not possess 85.5 million freely transferable shares of LTC common stock. Neither Arch Hill nor Van Andel disclosed this fact. They also never disclosed any facts related to a pending or potential LTC reverse stock split.

45.    On July 15, 2003, in reliance on, and as a result of, the representations made by Arch Hill and Van Andel and ignorant about the status of the 85.5 million shares and the possibility of a reverse stock split, Haliotis transferred the €9 million in purchase consideration for the LTC shares to the third party account of Mr. De Jong. Consistent with their agreement, this payment was intended by Haliotis to be released to Arch Hill *only upon transfer of the 85.5*

*million shares of LTC stock by Arch Hill* to the third party account, which would hold the shares for the benefit of Haliotis and would follow Haliotis's directions regarding all matters concerning the shares, including their voting and disposition.

46.    Contrary to Haliotis's reasonable expectations, Mr. De Jong transferred the purchase consideration to Arch Hill's account on July 17, 2003 without notifying Haliotis and without first receiving the LTC stock from Arch Hill.  The Dutch civil notary Oversight Board subsequently determined that this conduct by Mr. De Jong was improper.

47.    From the time of the July transaction with Haliotis and continuing through the present, reports on Schedules 13D by Arch Hill, as well as periodic reports and other filings with the SEC by LTC were false and misleading.  They omitted any reference to or description of the Haliotis transaction, thereby concealing Defendants' intent from the outset to deprive Haliotis of the full benefits of ownership and the full use of the LTC shares it had been promised by Arch Hill and Van Andel.

48.    On July 28, 2003, just days after Van Andel and Arch Hill caused the civil notary to transfer to them Haliotis's consideration without having first transferred the LTC shares, Arch Hill caused LTC to effect a 20-to-1 reverse stock split that affected only issued and outstanding stock, but left in place the level of authorized stock.

49.    In violation of the Exchange Act, LTC did not provide any advance notice—much less ten day's advance notice—of the precise timing or terms of this reverse split.

50.    The reverse split caused the 85.5 million shares Haliotis agreed to purchase just weeks earlier to become approximately 4.275 million shares.  Haliotis later learned that Arch Hill did not possess even this smaller number of shares because Arch Hill's holdings following the split had become approximately 3.1 million shares.

51.    In a presentation dated September 2003 endorsed by the board of management of LTC, (a copy of this presentation is attached hereto as Exhibit "E"), LTC confirmed to (potential) investors that a stock split took place on July 28, 2003.

52.    The reverse stock split freed authorized shares that Arch Hill could use to convert its existing convertible LTC debt into newly issued LTC common stock, thereby guaranteeing its domination and control of LTC.  As a practical matter, the reverse stock split allowed LTC and Arch Hill immediately to dilute Haliotis's interest.  Arch Hill thus ensured it had the ability to preserve its control position and could dramatically reduce the value and influence of what Haliotis thought it had purchased.

53.    Throughout the summer of 2003, Haliotis demanded that Arch Hill transfer the LTC securities it purchased, but Arch Hill refused to do so.

54.    By letter dated August 15, 2003 (attached hereto as Exhibit "F," together with an English translation), Mr. De Jong notified Haliotis that he had previously transferred Haliotis's funds to Arch Hill despite the fact that delivery of the LTC shares had not been effected by Arch Hill.

55.    On August 20, 2003, Arch Hill sent a letter to Haliotis confirming that on the date the purchase price was paid to the third party, that entity did not have any LTC shares in its possession.

56.    On August 21, 2003, however, Van Andel met with De Reus and provided various assurances that Haliotis would shortly receive the LTC stock that it had paid for.  Based on his long history of dealing with Arch Hill, the control Arch Hill exercised over LTC, and Van Andel's position as an LTC director, Haliotis reasonably relied on Van Andel's assurances.

57.    Through the end of 2003 and into 2004, Haliotis continued unsuccessfully to seek delivery of the purchased securities.

58.    Beginning in February 2004, Arch Hill started reaping the benefits of the reverse split by converting its LTC securities. Arch Hill increased its holdings of LTC common stock to approximately 8.7 million shares and dramatically diluted the 4.275 million shares it agreed to sell to Haliotis.

59.    SEC filings from April 2004 reveal that by January 2004, Arch Hill had funneled all, or substantially all, of the cash provided by Haliotis to LTC. In return, Arch Hill received various LTC convertible securities.

60.    In April 2004, following the infusion of Haliotis's cash into LTC, Arch Hill, LTC, and their affiliates entered into a debt-exchange agreement pursuant to which, Arch Hill—not Haliotis—received approximately $8 million worth of LTC common stock, warrants, and convertible debentures. As part of this same transaction, Arch Hill's affiliate converted $23 million in debt into 21 million shares of LTC stock, thereby cementing Arch Hill's control over LTC.

61.    Following this transaction, Arch Hill and its affiliate held approximately 35.8 million shares of the 39 million outstanding shares of LTC common stock. Arch Hill had made the LTC interest that Haliotis purchased in July 2003 almost inconsequential.

62.    On May 11, 2004, Van Andel met with Haliotis's lawyer, Ms. Ten Brink. In that meeting, Van Andel confirmed that 85,500,000 shares of LTC common stock were being held by a third-party for Haliotis's benefit. This representation by Van Andel was confirmed by a May 21, 2004 letter to Arch Hill and was not disputed until parties entered into litigation later in November of 2004.

63.    On June 10, 2004 Van Andel wrote a letter to De Reus, further confirming Haliotis's status as an LTC shareholder.

64.    On November 5, 2004, Arch Hill initiated court proceedings in the Netherlands by a subpoena articulating Arch Hill's position that it actually performed its obligations under the July 2003 agreement, but that Haliotis was in default of its obligations of those agreements.  It was only in this official court document that Arch Hill stated *for the first time* that delivery of the bargained-for economical interests in the LTC shares already took place on July 17, 2003.

65.    Moreover, by this time, the LTC shares in question had already lost substantial value from the time of the Haliotis transaction more than a year earlier.  Indeed, at the time of the November 2004 transfers, LTC stock traded between $0.65 to $0.23 per share compared to $2 per share (on a split-adjusted basis) in July 2003.

66.    In subsequent court papers, in December 2004, Arch Hill and Van Andel disclosed for the first time to Haliotis that the arrangement for delivery of shares to the Arch Hill affiliate was not, as they had previously represented to Haliotis, and was never intended to be, for the use, benefit, and ownership of Haliotis.

67.    Instead, at this point, and for the first time, Haliotis learned that Arch Hill and Van Andel did not intend to, and at all times relevant to the transaction lacked the ability to, transfer 85.5 million LTC shares (or 4.275 million shares on a split-adjusted basis) to Haliotis as they had promised to do.  Haliotis further learned for the first time that Arch Hill and Van Andel were transferring LTC shares that would be held by the Arch Hill affiliates for the benefit of *both* Arch Hill and Haliotis.  Haliotis thus would not have the power to vote or dispose of any of the stock it had purchased nearly a year and a half earlier.

68.    Despite its revelation in December 2004 that Arch Hill intended to jointly hold and control LTC common stock with Haliotis, Arch Hill has never disclosed this relationship in any public filing or statement.

69.    Had Haliotis known the truth, it would not have entered the July 2003 transaction.

### First Cause of Action
### (Violation of 10b-5 of Securities Exchange Act-against all Defendants)

70.    Plaintiff repeats and incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

71.    As set forth in more detail above, Defendants LTC and Arch Hill: (a) employed devices, schemes, and artifices to defraud; (b) made false statements of material fact and omitted to state material facts, which defendants had a duty to disclose and which were necessary in order to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Haliotis in connection with its purchase of securities.

72.    This conduct included but was not limited to: (i) Arch Hill and Van Andel's misrepresentations made to induce Haliotis's entering into the July Agreement; (ii) the filing of false and misleading documents with the SEC; (iii) the failure to file required notices and other documents with the SEC; and (iv) Arch Hill and Van Andel's continued misrepresentations to Haliotis regarding both Arch Hill's ability to deliver LTC stock and its intention to do so.

73.    The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to enable Arch Hill, and LTC to use the "proceeds" of the July transaction for LTC's benefit without performing under the terms of the agreement.

74.    Van Andel, as a top executive, is liable along with LTC and Arch Hill as a direct participant in the wrong complained of herein.  Through his position of control and authority

with LTC and with Arch Hill, Van Andel was able to control, and was in fact directly responsible for the statements disseminated by Arch Hill and LTC. With knowledge of the material facts Van Andel purposefully omitted from these statements, Van Andel engaged in a scheme to cause and did cause the omissions of materials facts and misstatements as alleged herein.

75.    Defendants continued their fraudulent scheme through their manipulation of information provided in their SEC filings, when they in fact filed them.

76.    As set forth in more detail above, Arch Hill, LTC and Van Andel acted with scienter in that they had actual knowledge of the manipulation and falsity of the misstatements alleged herein.

77.    At the time of Defendants' representations and omissions, Haliotis had no knowledge of the falsity of the misstatements, or the other misinformation described above. These representations were material to Haliotis's decision to enter into the July Agreement, and its subsequent decision to transfer its shares in Dome Arch and additional funds to a third party. Had Haliotis known of the true facts stated herein, Haliotis would not have purchased stock in LTC and would not have transferred what amounted to substantial consideration to Arch Hill.

78.    Haliotis became aware of Defendants' fraudulent scheme in December 2004 when it was informed for the first time that Arch Hill never intended to provide Haliotis with freely tradable LTC stock, which Haliotis could do with what it wished.

79.    As a direct and proximate result of the wrongful conduct of Arch Hill, LTC, and Van Andel, Haliotis suffered damages in an amount according to proof at the time of trial.

80.    By virtue of the foregoing, Arch Hill, LTC, and Van Andel have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## Second Cause of Action
### (Common Law Fraud against Arch Hill, Van Andel)

81.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-80 as if set forth fully herein.

82.    As alleged above, Defendants Van Andel and Arch Hill conspired together and knowingly and/or recklessly made misrepresentations to Plaintiff. Amongst other misrepresentations, Van Andel and Arch Hill represented that they had the ability to sell beneficial ownership of 85.5 million unrestricted shares of LTC common stock to Haliotis at a time when they knew that they could not do so because they did not possess these shares.

83.    Defendants Van Andel and Arch Hill made these misrepresentations to induce Plaintiffs to enter into the July Agreement, and to subsequently transfer its cash and shares in Dome Hill through a third party to Arch Hill.

84.    Defendants Arch Hill and Van Andel actively concealed this fraud through a series of additional misrepresentations concerning their ability and intention to consummate the transaction as set forth above.

85.    Plaintiff reasonably relied on these misrepresentations to its detriment by transferring approximately €9 million worth of consideration to Arch Hill absent any valuable consideration in return.

86.    Plaintiff suffered and continues to suffer damages, in an amount according to proof at the time of trial.

## Third Cause of Action
### (Breach of Fiduciary Duty against Arch Hill and Van Andel)

87.    Plaintiff repeats and incorporates by reference the allegations in paragraphs 1-86 as if set forth fully herein.

88.    As alleged above, Defendants Van Andel and Arch Hill conspired together and knowingly and/or recklessly made misrepresentations to Plaintiff. Amongst other misrepresentations, Van Andel and Arch Hill represented that they had the ability to sell beneficial ownership of 85.5 million unrestricted shares of LTC common stock to Haliotis at a time when they knew that they could not do so because they did not possess these shares.

89.    Defendants Van Andel and Arch Hill made these misrepresentations to induce Plaintiffs to enter into the July Agreement, and to subsequently transfer its cash and shares in Dome Hill through a third party to Arch Hill.

90.    Defendants Arch Hill and Van Andel actively concealed this fraud through a series of additional misrepresentations concerning their ability and intention to consummate the transaction as set forth above.

91.    Plaintiff reasonably relied on these misrepresentations to its detriment by transferring approximately €9 million worth of consideration to Arch Hill absent any valuable consideration in return.

92.    Plaintiff would not have entered into the transaction absent Defendants' misrepresentations.

93.    Plaintiff suffered and continues to suffer damages, in an amount according to proof at the time of trial.

**WHEREFORE,** Haliotis is entitled to the following relief:

(i)    an award of compensatory damages against all Defendants;

(ii)    an award of costs; and,

(iii)    such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Haliotis hereby demands trial by jury of all eligible claims.

Of counsel:

Theodore Altman
Joshua Sohn
DLA Piper US LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

J. Travis Laster (#3514)
Matthew F. Davis (#4696)
Abrams & Laster LLP
Brandywine Plaza West
1521 Concord Pike, Suite 303
Wilmington, Delaware 19803
(302) 778-1000

*Attorneys for Haliotis Investments S.A.*

Dated:  November 3, 2006

# Exhibit A



## Confidential Term Sheet

| | |
|---|---|
| Issuer: | Lithium Technology Corporation (the "Company")<br>OTC BB: LITH |
| Amount: | $12,000,000 (the "Financing")<br>$8,000,000 ("First Closing")<br>$4,000,000 ("Second Closing")- Upon Effectiveness of the Registration Statement |
| Security: | Series C Convertible Preferred Stock (the "Series C) and Warrants |
| Closing Date: | May 2003 (the "Closing") |
| Stated Value: | $12,000 per share ("Stated Value") |
| Maturity: | Perpetual Preferred |
| Dividend: | 8% per annum increasing to 12% per annum on July 1, 2004. The dividend shall be payable in cash or common stock at the option of the Company. The dividend for the first year shall be paid at the Closing in common shares, based on the Fixed Conversion Price. Thereafter, the dividend shall be paid quarterly. |
| Fixed Conversion Price: | The Series C shall be convertible into common stock at $0.12 per share (the "Fixed Conversion Price"). |
| Mandatory Conversion: | Beginning 180 days following the Effective Date, if the closing bid price for the Company's common stock exceeds $0.30 for a period of 10 consecutive trading days, the Series C shall automatically convert into common stock at the applicable conversion price. |
| Warrants: | *Series A Warrants exercisable @ $0.001:*<br><br>The Investors shall be issued 100,000 Series A Warrants exercisable at $0.001 per warrant (the "Series A Warrants") for each share of the Series C purchased. The Series A Warrants shall be exercised within 24 hours of the Closing.<br><br>*Series B Warrants exercisable @ $0.12:*<br><br>The Investors shall be issued 50,000 Series B Warrants exercisable at $0.12 per warrant (the "Series B Warrants") for each share of Series C purchased. The Series B Warrants shall have a five (5) year term and at no time may a holder exercise an amount of warrants that would cause their ownership to exceed 4.99% of the Company's common stock outstanding at the time of exercise. |
| Warrant Redemption | Beginning twelve (12) months following the Effective Date, if the closing bid price of the Company's common stock exceeds $0.24 for a |

23-04-2003  19:14  FROM

period of 20 consecutive trading days, the Series C Warrants may be redeemed by the Company at $.01 per warrant.

**Registration:**

The Company shall file a Registration Statement on Form S-2 (or Form S-1 if the Company is not eligible to file a Form S-2) covering the Common Shares underlying the Series C and the Warrant Shares no later than thirty (30) days after the Closing, and use its best efforts to have the Registration Statement declared effective within ninety (90) days after the Closing.

**Liquidated Damages:**

In the event the Registration Statement has not been declared effective within one hundred and twenty (120) days of the Closing, for the thirty (30) day period beginning ninety (90) days after the Closing, the Company shall pay to the Investors liquidated damages equal to 3.0% of the amount invested and shall pay to the Investors liquidated damages equal to 1.5% of the amount invested for each subsequent 30-day period.

**Right of First Offer:**

For any equity or equity linked private financing consummated within 12 months after the Closing, the Investors in the Series C shall have a right of first offer to purchase all or part of the private financing. The Investors shall have five (5) trading days to respond. A carve out of this provision will be granted to the Issuer for the issuance of stock for situations involving strategic partnerships, acquisition candidates and public offerings.

**Most Favored Nations Exchange Option:**

For the twenty-four (24) month period after the Closing, if the Company does a private equity or equity linked financing (the "New Financing"), the holders of the Series C may exchange the Series C at the Stated Value for the securities in the New Financing.

**Senior Securities:**

Subject to a minimum of $1 million stated value of Series C outstanding, the Company shall not issue any securities or financial instruments that rank pari pasu or senior to the Series C without the approval of at least ¾ of the Series C outstanding.

**Anti-Dilution:**

The Conversion Price of the Series C and the Exercise Price of the Warrants shall be subject to adjustment for issuances of Common Stock at a purchase price of less than the then-effective Conversion Price or Exercise Price, such that the then applicable Conversion Price or Exercise Price shall be adjusted using a weighted average price based on such new issuances subject to customary carve outs.

**Equity Treatment:**

The Series C shall include provisions needed for the Company's auditors to deem the Series C as equity on the balance sheet.

**Change of Control:**

In the event of a change of control transaction, (third party acquiring greater than 50% in voting rights in one or a series of related transaction) the Holders may elect to have the Series C redeemed by the Company at its Stated Value. The Company shall satisfy the redemption request in cash or common shares at the Company's option.

**Legal Fees:**

The Company shall pay the legal and due diligence expenses of the Investors at First Closing up to a maximum of $40,000.

**Arch Hill Notes:**

Concurrently with the Closing, Arch Hill shall exchange 100% of the principal and accrued interest of its Subordinated Loans, Partnership Loans, and any Bridge Loans made prior to December 31, 2002

---

H.C. Wainwright & Co., Inc.                    2                    Confidential

(approximately $26 million), into a new Series of Preferred with the same terms as the Series C Financing.

**Arch Hill Series A Preferred:**   In conjunction with the Closing, Arch Hill shall convert all of its Series A Preferred Stock (100,000 shares) into the Company's common stock. The Series A shall convert into 111,340,524 shares of common stock.

**Former Ilion Notes owned by Arch Hill:**   In conjunction with the Closing, Arch Hill shall convert all of its Ilion Notes ($3,949,000) at face value into common stock at $0.10 per share.

**Arch Hill Series C Investment:**   Arch Hill shall invest a minimum of $2,500,000 of new capital into the Series C Financing. At the first closing, Arch Hill shall convert the outstanding bridge loans made to the Company since January 1, 2003 (approximately $1,750,000) into the Series C Preferred. The amount converted will count towards meeting their new Investment commitment.

# Exhibit B

FAX VOOR DAAN MARTIN
STRIKT PERSOONLIJK
0235393641

Betreft: voorstel Dome Arch exit Aris de Reus

Bloemendaal, 30 juni 2003

Beste Daan,

Ik doe je hierbij het voorstel toekomen op welke wijze en tegen welke kondities Haliotes zijn belang in
Dome Arch aan Arch Hill Capital kan overdragen in combinatie met een additionele investering van
Euro 5 mio in LTC aandelen.
Dit voorstel is gebaseerd op onze gesprekken van de laatste dagen.

Uitgangspunt is dat Arie de Reus in de toekomst uitsluitend als partner cq co-investor met Arch Hill zaken
wil doen waarbij hijzelf bezit of in voorkomende gevallen geïnvesteerd gaat worden.
In deze gedachtegang past zijn deelname in Dome Arch niet.
Zowel Arch Hill als Arie de Reus hebben de wens geuit om ook op het gebied van onroerend goed
ontwikkeling en investeringen nauw samen te werken en de goede onderlinge banden te versterken die
reeds lange tijd bestaan.

Gegeven deze intenties is het voorstel:

1. Haliotes verkoopt zijn belang in Dome Arch te weten het belang (Arch Hill Ventures en Arch Hill Real
Estate) tegen de waardering van zijn belang per ultimo 2002 aan Arch Hill Capital.
Dit zal ongeveer Euro 4,2 mio bedragen te weten Euro 5 mio minus het negatieve resultaat 2002 van 16%.

2. Tevens koopt Haliotes van Arch Hill Capital voor Euro 5 mio aandelen LTC tegen een waardering van
$ 0,12 per aandeel, welke bezit door de Stichting Gemeenschappelijk Bezit Gaia zal worden beheerd ca
conform de behandeling van alle certificaathouders welk bezit zoals bekend in tranches zal worden
vrijgegeven ivm een ordelijk verloop van de beurskoers.

3. Het voorstel is dat gegeven het belang van Haliotes in LTC Daan Martin uitgenodigd zal worden toe te
treden tot de Board als non-executieve member. In deze Board heeft Arch Hill Capital een meerderheid van
stemmen.

Met het bovenstaande voorstel is de wens van Arie tot uitsluitend co-investments ingevuld. Arch Hill
Capital heeft middels de additionele aankoop van aandelen LTC door Haliotes meer financiële ruimte
verkregen en kan zonodig daarmede LTC verder steunen.

Ik neem aan dat wij donderdag as om 12uur bij Arch Hill in Den Haag het bovenstaande zullen afronden en
dat de uitvoering aansluitend zal plaats vinden middels de overdracht van de aandelen Dome Arch van
Haliotes aan Arch Hill Capital en overdracht door Arch Hill Capital aan Haliotes van het recht op
uitreiking door de Stichting Gemeenschappelijk Beheer Gaia van certificaten LTC (A) rechtgevende op
87,4 mio aandelen common stock LTC (Euro 4,2 mio plus Euro 5 mio maal valutakoers 1,14 tegen $ 0,12
per aandeel).

Hoor van je, met vriendelijke groet

Direktie Arch Hill Capital n.v.

Chris van den Berg

Facsimile message for Daan Martin
Private

RE: proposed exit by Arie de Reus from Dome Arch

Bloemendaal, 30 June 2003

Dear Daan,

By means of this letter I would like to make clear in what way and by what means Haliotis can transfer its interest in Dome Arch to Arch Hill combined with the additional investment of EUR 5,000,000 in LTC shares.

Basic premise is that Arie de Reus in future only wants to be a partner/co-investor when doing business with Arch Hill. In addition to which Mr de Reus wants to decide by himself if an investment is going to be made if an occasion arises. Seeing this change in business acumen the participation in Dome Arch is no longer desired.

Arch Hill and Arie de Reus have expressed the whish to cooperate closely in the field of the real estate market and strengthen the close ties that have existed between them for a long time.

Given these intentions we propose the following:

1.  Haliotis will sell its interest in Dome Arch to Arch Hill Capital. The purchase price will be determined by looking at the value of the interest at the end of 2002.
2.  Haliotis will buy LTC shares for USD 0.12 per share from Arch Hill Capital in the amount of EUR 5,000,000.-. The ownership of these shares will be administered by Stichting Gemeenschappelijk Bezit GAIA in observance of the rules that apply to all holders of depository receipts of shares. The ownership will be released in tranches as we need to ensure a stable price on the stock exchange.
3.  Give the interest of Haliotis in the share capital of LTC we propose that Daan Martin will become a member of the board of directors as a non-executive member. Arch Hill Capital has the majority of the votes in the board of directors.

The propositions mentioned above comply with Arie de Reus' wish to become a co-investor. Through the purchase of the LTC shares by Haliotis, Arch Hill Capital will obtain more funds which will enable it to further support LTC.

1

I assume that we will finalise these propositions next Thursday 12:00a.m in the offices of Arch Hill in The Hague. If we reach an agreement the shares held by Haliotis in the capital of Dome Arch will be transferred to Arch Hill Capital. Arch Hill Capital will transfer to Haliotis the right of delivery of the depository receipts LTC by Stichting Gemeenschappelijk Bezit GAIA. These depository receipts entitle Haliotis to 87,4 million common stock LTC (EUR 4.2 million and EUR 5 million multiplied by the exchange rate USD 1.14 and a purchase price of USD 0.12 per share).

Looking forward to hearing from you.

Kind regards,

Management Board of Arch hill Capital N.V.

Signed by: Chris van den Berg

2

Exhibit C

**Betreft: voorstel omruil en additionele storting LTC/GAIE – Dome Arch**

- Refererend aan het memo van Chris v.d. Berg zoals dat als basis heeft gediend voor de bespreking van 3 juli jl. gaan we uit van een omrekenverhouding € 1,- voor $. 1,14
- € 5.000.000,- x 1,14 = $ 5.700.000,-
- Koop aandelen LTC tegen $ 0,12 = stuks 47.500.000,- aandelen LTC
- Additioneel wordt er gestort € 4.000.000,- (onder verrekening Hormix lening inclusief rente = € 527.500, dus te storten € 3.472.500), = $ 4.560.000,- waarvoor aandelen LTC worden aangekocht tegen $ 0,12 = stuks: 38.000.000,- aandelen LTC
- In totaal zullen er dus 85.500.000,- aandelen worden geadministreerd.
- Er wordt geen managementvergoeding berekend maar een winstdeling overeengekomen, evt. te omschrijven als over rigth en wel als volgt:
- Bij afrekening van de over right wordt eerst verrekend een vergoeding van 8 % per jaar;
- Over het meerdere wordt een vergoeding overeengekomen van 15 %, echter met een plafond een stijging van 100 % t.o.v. de verkrijgingprijs. Over het meerdere is vervolgens een vergoeding verschuldigd van 7,5 %, e.e.a. zonder plafond.
- Deze vergoeding wordt gelimiteerd tot een periode van 2,5 jaar en eindigt derhalve per 1 januari 2005. Per die datum is te allen tijde de vergoeding verschuldigd, onder verrekening van de verschuldigde 8 % per kalenderjaar, of op of voor die datum is verkocht dan wel over de als dan geldende beurswaarde.
- Daan Martin zal worden benoemd als Member of the Board van LTC tegen voor hem aanvaardbare voorwaarden en condities.

Indien deze basispunten akkoord zijn dient e.e.a. eerst in een onderlinge overeenkomst te worden vastgelegd die zal worden getekend voor Arch Hill alsmede voor Haliotis Investments SA. Na ondertekening zal de overboeking van de additionele fonds plaatsvinden door Haliotis en zal Arch Hill zorg dragen dat e.e.a. notarieel wordt vastgelegd. De kosten van de notariële overdracht zullen door Arch Hill worden gedragen.

5-7-03

5-7-03

Regarding: proposed swap and additional payment LTC/GAIA – Dome Arch

- Referring to the memo of Chris van den Berg which served as the basis for the meeting that took place on 3 July we assume the conversion price for EUR 1,- to be USD 1.14;
- EUR 5,000,000.- x 1.14 = USD 5,700,000.-;
- The LTC shares will be purchased for a purchase price of USD 0.12 per share. 47,500,000 shares LTC;
- Additional payment of EUR 4,000,000.- (the Hormix loan including interest EUR 527.500 will be set off, resulting in a payment of EUR 3.472.500) = USD 4.560.000,-. This amount will be used for the purchase of 38.000.000 LTC shares for a purchase price of USD 0,12 per share;
- In total 85.500.000 shares will be recorded/entered into the books;
- No management remuneration will be paid, instead we will agree upon a profit-sharing scheme, possibly specified as an over right;
- In settlement of the over right a remuneration of 8% per annum will be set-off;
- A remuneration of 15% will be agreed upon for the excess, limited by a maximum rise of 100% with regard to the purchase price. Any excess is subject to a remuneration of 7.5% without any ceiling;
- This remuneration will be limited to a period of 2.5 years, therefore terminating on 1 January 2005. As of that date a remuneration is payable at all time, set off against the remuneration of 8% due per calendar year. If the shares are sold on or before that date a remuneration is payable based on the market value;
- Daan Martin will be appointed as a member of the board of LTC according to conditions acceptable to him.

If these fundamental issues are agreed upon they will have to be laid down in a mutual agreement which will be signed by Arch Hill as well as by Haliotis Investment SA. After the signing Haliotis will take care of the transfer of the additional funds and Arch Hill will ensure that a civil-law notary will draw up all the necessary deeds. The notarial charges connected to the transfer will be paid by Arch Hill.

Signed by Mr Van Andel and Mr A. De Reus on 5 July 2003.

# Exhibit D

# Barents & Krans

# F A X

Number of pages  :  4
Date:  :  July 8, 2003

Parkstraat 107
P.O. Box 30426
2500 GK  The Hague
The Netherlands

Phone  +31 - 70 - 376 06 06
Telefax  +31 - 70 – 363 38 30

To  :  **Haliotis Investments S.A.**
*Attn Mr D.J.W. Martin*
*Faxnumber 023 - 539 38 61*

**Arch Hill Capital N.V.**
**Arch Hill Real Estate N.V.**
**Stichting Gemeenschappelijk Bezit GAIA**
**Arch Hill Management B.V.**
*Attn Mr H.H. van Andel*
*Faxnumber 070 – 416 60 50*

From  :  O.W. de Jong
Our ref.  :  JO/RZ 2031405
Re.  :  Agreement Haliotis and AHC dated July 5, 2003

Dear Sirs,

I have been instructed by the company: Arch Hill Capital N.V. ("AHC") to prepare a number of (notarial) deeds in order to formalise the agreement between AHC and several related parties on the one hand and the company: Haliotis Investments S.A. ("Haliotis") on the other hand, the main points of which have been laid down in a proposal ("voorstel omruil en additionele storting LTC/GAIA – Dome Arch") signed for approval by Mr H.H. van Andel and by Mr A. de Reus on July 5, 2003.

On the basis of the aforementioned proposal the following steps are to be taken:

1.  Haliotis will sell and transfer its fifty (50) shares in the capital of the company: Dome Arch Capital N.V. ("Dome Arch") to AHC for a purchase price of EUR 5,000,000.—, effective per the 31st day of December 2002.

2.  Haliotis will buy from AHC the beneficial ownership of 47,500,000 shares of Common Stock in the capital of the company: Lithium Technology Corporation ("LTC") for a purchase price of USD 0.12 per share of Common Stock LTC, effective per the 31st day of December 2002; the total purchase price of USD 5,700,000.— will be set-off against

*Our liability shall always be limited to the amount which is made payable under the firm's professional liability policy in the matter concerned.*

the purchase price mentioned under 1. (for this transaction the parties have agreed that EUR 1.— equals USD 1.14).

3.  The company: Arch Hill Real Estate N.V. ("AHRE") will make use of its right to "call" the nine (9) depository receipts, each corresponding to one (1) share in the capital of the company: HILLGATE Properties N.V., as set out in the "optieovereenkomst" signed on June 30, 2003. The purchase price to be paid by AHRE for said depository receipts has been fixed by the parties on EUR 527,500.—. The depository receipts will be transferred by Haliotis to AHRE by a notarial deed of transfer, effective April 1, 2003.

4.  The debt of AHRE arising from its obligation to pay the purchase price mentioned under 3. will be assumed by AHC in accordance with Section 155, Book 6 of the Netherlands Civil Code ("schuldovername"), which debt assumption will be approved by Haliotis.

5.  Haliotis will buy from AHC the beneficial ownership of 38,000,000 shares of Common Stock LTC for a purchase price per share of USD 0.12, effective April 1, 2003; of the total purchase price of USD 4,560,000.— an amount of USD 601,350.— (EUR 527,500.— x USD 1.14 = USD 601,350.—) will be set-off against AHC's debt arising from the aforementioned debt assumption, the remainder of EUR 3,472,500.— will be paid by Haliotis directly into the account of AHC.

6.  the beneficial ownership of in total 85,500,000 shares of Common Stock LTC will be held for the risk and account of Haliotis by the foundation: Stichting Gemeenschappelijk GAIA ("SGB"). SGB is entitled to convert the legal relationship between SGB and Haliotis into a mere formal legal relationship, in the course of which SGB will issue depository receipts (Class A) to Haliotis. The depository receipts (Class A) to be issued to Haliotis shall relate with 85,500,000 shares of Common Stock LTC.

7.  a.  the company: Arch Hill Management B.V. ("AHM") will have a claim on the beneficial ownership of (or the depository receipts with respect to) the shares of Common Stock LTC held for the risk and account of Haliotis;
    b.  the extent of the aforementioned claim will be calculated:
        1.  when Haliotis sells part or all of its beneficial ownership of (or the depository receipts with respect to) the underlying shares of Common Stock LTC to a third party; or
        2.  if this is later than the moment referred to hereinbefore under 7.b.1., on January 1, 2005, or the first day thereafter on which a stock exchange on which a share of Common Stock LTC is publicly traded is open for business;
    c.  the extent of the aforementioned claim will be calculated as follows:
        1.  if the value of one (1) share of Common Stock LTC equals or is less than USD 0.24, the claim is equal to fifteen percent (15%) of the positive difference between:
            a.  the value of 85,500,000 shares of Common Stock LTC; and
            b.  the price paid by Haliotis (USD 10,260,000.—) increased with eight percent (8%) on a non-compounded annual basis (calculated from July 1, 2003);
        2.  if the value of one (1) share of Common Stock LTC is higher than USD 0.24, the claim is equal to the addition of:

Our liability shall always be limited to the amount which is made payable under the firm's professional liability policy in the matter concerned.

advocaten notarissen

# Barents & Krans

    a. the amount calculated in accordance with section 7.c.1. on the assumption that the value referred to in 7.c.1. is exactly USD 0.24 per share of Common Stock LTC; and

    b. seven and a half percent (7.5%) of the positive difference between the value of 85,500,000 shares of Common Stock LTC and USD 20,520,000.—;

d. for the calculations in accordance with section 7.c. the value per share of Common Stock LTC is to be set as follows:

    1. in the event mentioned under 7.b.1., the value per share of Common Stock LTC is equal to the price the third party has agreed to pay for such a share of Common Stock LTC;

    2. in the event mentioned under 7.b.2., the value per share of Common Stock LTC is equal to the quoted stock price on January 1, 2005, or the first day thereafter on which a stock exchange on which a share of Common Stock LTC is publicly traded is open for business;

e. in the event mentioned under 7.b.1., Haliotis will transfer to AHM such a part of its beneficial ownership – or such a number of depository receipts - the value of which (calculated on exactly the same basis as described hereinbefore under 7.c. in conjunction with section 7.d.1.) is equal to the (amount of the) claim calculated in accordance with section 7.c. In conjunction with section 7.d.1. Haliotis will enable AHM to join in its exit;

f. in the event mentioned under 7.b.2., Haliotis will transfer to AHM such a part of its beneficial ownership – or such a number of depository receipts - the value of which (calculated on exactly the same basis as described hereinbefore under 7.c. in conjunction with section 7.d.2.) is equal to (the amount of) the claim calculated in accordance with section 7.c. In conjunction with section 7.d.2.

8. AHC will ensure that Mr D.J.W. Martin will be appointed as Member of the Board of LTC (under terms and conditions yet to be determined as soon as practicable).

Upon your approval of the above, I will prepare the necessary documents. Please indicate said approval by signing this fax "for approval" and faxing said co-signed version of this fax back to my office (see direct faxnumber above).

Upon the signing of this fax "for approval" by all the parties to the agreement, Haliotis will pay the amount of EUR 3,472,500.— into the account of AHC with ING Bank N.V. (Tournooiveld Office, The Hague), account number 66.83.63.177, which payment will cause SGB to hold the beneficial ownership of the 85,500,000 shares Common Stock LTC for the risk and account of Haliotis.

Yours sincerely,

Olaf de Jong

Our liability shall always be limited to the amount which is made payable under the firm's professional liability policy in the matter concerned.



**Barents & Krans**

FOR APPROVAL:                          FOR APPROVAL:

Hallers Investments S.A.              Arch Hill Capital N.V.
By: D.J.W. Martin    By A. Varuker.   By: H.H. van Andel

FOR APPROVAL:                          FOR APPROVAL:

Arch Hill Real Estate N.V.           Stichting Gemeenschappelijk Bezit GAIA
By: H.H. van Andel                   By: H.H. van Andel

FOR APPROVAL:

Arch Hill Management B.V.
By: H.H. van Andel

Our liability shall always be limited to the amount which is made payable under the firm's professional liability policy in the matter concerned.

TOTAL P.05

# Exhibit E




# Lithium
## Technology Corporation

# Presentation to Investors
## David Cade and Franz Kruger

## September 2003





## Forward Looking Statement

2

This presentation may contain forward-looking statements, which are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements involve risks and uncertainties that could cause actual results to differ materially. Factors which could cause or contribute to such differences include the timely development and market acceptance of products and technologies, competitive factors, demand for products and services and other risks described in Lithium Technology Corporation's SEC reports and filings.



**LTC Lithium**
Technology Corporation

**GAIA**

3

## Overview

- **Combination of Lithium Technology Corporation (OTC BB: LTHU.OB) and GAIA GmbH positions the Company to capture the North American and European advanced battery market opportunity**

- **Addressing National Security, Stationary Power, and Transportation segments of the global rechargeable battery market, which exceeds $20 billion annually**

- **The "new" LTC has numerous product offerings under the GAIA brand name available immediately for these markets, including 12-Volt, 42-Volt and 144-Volt batteries, based on 6-, 9-, 27-and 60 -Amp hour building block cells; 32 patents issued, 33 patents pending**

- **Actual revenues of $1.2 million in 2002; projected revenues of $2.9 million for 2003 and $8.1 million for 2004**

- **Seeking $10 million of additional equity financing to provide for sales, manufacturing, and working capital needs until profitability in 2005**



# LTC Lithium
### Technology Corporation

## Seasoned Management Team



**David J. Cade**

- Chairman & CEO, LTC
- 23 years of sales & marketing experience at LTC, Interdigital Communications Corp., COMSAT Corp., Lockheed Martin, and AT&T) Orchestrated 7 International strategic alliances
- Also worked at the Department of Defense & US Air Force
- M.B.A., Syracuse University Bachelors, University of Illinois



**Franz J. Kruger**

- President & COO, LTC
- Joined GAIA in 2001 as CEO
- 25 years of experience in the battery industry, mainly with VARTA (largest battery manufacturer in Europe) as an Executive Board Member and Technical Director of R & D
- Ph.D., Metallo-Organic Chemistry, University of Stuttgart

**Ralf Tolksdorf**

- CFO, LTC
- Joined GAIA in 2000 as CFO
- 10 years of financial- and management-consulting experience at SMR GmbH (which Mr. Tolksdorf founded), and at various business and industrial firms
- Economics degree, University of Göttingen



**Andrew J. Manning**

- Executive Vice President & General Manager, Lithium/GAIA
- 32 years of manufacturing, R&D, and engineering experience at LTC, Congoleum, Tarkett, Celanese, and Pfizer
- Advanced work performed in thin-film process development, engineering and plant design
- Ph.D., Chemical Engineering, Cornell University



**Hans-Joachim Steinwachs**

- Executive Vice President & General Manager, Lithium/GAIA
- 15 years of manufacturing and production experience at GAIA and Varta
- Directed production of a large lithium-ion plant, including advanced battery assembly lines and automatic cell assembly
- Mechanical Engineering degree, University of Bochum



4





## Product Differentiators

- **Large-format batteries and cells that are modular**
  - Customizable to suit various sizes, shapes, and performance demands
  - Modularity allows for design flexibility using common "building blocks"

- **High-power density that recharges in a fraction of the time**
  - Low internal resistance allows for rapid charging and discharging
  - Thin, prismatic (flat) construction has superior heat dissipation

- **Broad range of operating temperatures**
  - From -40°C to +55°C

- **Superior safety and long operating life**
  - Proprietary additives, chemistry and design meet stringent safety demands
  - Designed to provide many thousands of charge/discharge cycles

- **Advanced manufacturing techniques**
  - Low cost, environmentally friendly extrusion and assembly drives scalability and high gross margins

5



**LTC Lithium**
Technology Corporation

*Advantages of Lithium-Ion Over Other Chemistries*

- **Versus Lead Acid**
  - Lithium-ion is smaller and lighter
  - Better suited to pulse power generated by regenerative braking, improves fuel economy and reduces emissions
  - Significantly wider range of temperature tolerance
  - No deterioration of capacity when kept at a low state of charge

- **Versus Nickel-Metal Hydride**
  - Lithium-ion is smaller and lighter
  - Wider range of temperature tolerance
  - Substantially less heat generation allows for simplified air cooling and heavy-duty operation



6











# Target Markets







**National Security** demands high power output, broad operating temperatures, low weight, small size/footprint, rapid recharging and hundreds to thousands of recharge cycles; willing to pay a premium price and market need is growing quickly





**Stationary Power** requires high-quality, high-reliability power for telecom, computer, and mission-critical applications; premium, billion-dollar market; recent Northeast blackout will drive new backup power solutions, particularly for cellular networks

**Transportation** has a growing need for long-life, durable power storage for hybrid-electric and 42-volt systems; small market today with mass market potential

8



# National Security Market

**U.S. and its allies are changing the landscape of warfare: from a handful of infantry divisions to many smaller, more rapidly deployed soldiers equipped with power-hungry electronics**

- **"Land Warrior"** (night goggles, field rechargeables, etc)
- **"Silent Watch"** (stealth operations)
- **Manned ground vehicles – land-based and underwater**
- **Unmanned reconnaissance... support systems -- airborne...**
- **Satellite... systems**
- **Remotely controlled... systems and demolition robot...**

*Addressable market... the US and allies approx. $1B annually...*



9





**LTC Lithium** Technology Corporation

## Market Feedback – Specific Opportunities

**Existing Applications (Retrofit into existing cavities/packs)**

- US Military and NATO Allies seek to replace primary batteries with rechargeable batteries (CECOM initiative)
- US Military seeks rapid recharge capability for field batteries (CECOM initiative)
- US Military seeks lighter weight SLI batteries for all vehicles to reduce air transport and to benefit from standard advantages of lithium versus lead acid

**Developing Applications**

- DoD's Future Combat Systems Program is defining numerous unmanned vehicle applications that require advanced rechargeable batteries
- TACOM development of HEV platforms to reduce fuel consumption (supply line problem)
- TACOM development of EV platforms to reduce emissions on military bases
- Unmanned Aerial Vehicles [UAVs] for surveillance and ordinance delivery
- Military Robotics for surveillance
- Navy applications for submarines and All Electric Ship

10





11

## Stationary Power Market

Our growing dependence upon digital devices drives demand for uninterrupted power

- **Distributed Power**
  - Our new battery has higher power and longer life than incumbent solutions
  - Wide operating temperature provides increased flexibility and lower costs to telecommunications, cellular, cable TV, Internet, and remote users

- **Backup Power**
  - Commercial and industrial applications require uninterrupted power for mission-critical applications
  - Longer life and less maintenance than lead-acid batteries

*Addressable global market size : approx. $5B annually, growing to $7B by end of decade*



**LTC Lithium**
Technology Corporation

## Market Feedback – Specific Opportunities

- **Existing Applications**
  - Very cost-sensitive market – life cycle value proposition of lithium ion over lead acid must be made:
  - **Telecom:** Lower cost of facilities cooling/heating, less maintenance, remote monitoring included
  - **Solar:** Less maintenance, extended battery life
  - **UPS:** Space/weight savings, higher reliability, less maintenance, longer life

- **Developing Applications**
  - Drive to lower cost infrastructure for new installations (Wireless Loop)
  - Heightened awareness of need for backup systems following blackout in NE US
  - Opportunities with Wind Power
  - Opportunities for high-end systems

12



## Transportation Market

A fundamental shift is underway to add increasing quantities of electronics to vehicles

- The 12-volt standard lacks the necessary power; automakers are moving to a 42-volt standard
  - Commercial introduction in Japan in 2002, with Europe and U.S. expected to follow

- Hybrid Electric Vehicles are gaining increasing market acceptance; but nickel-metal hydride batteries are heavy, expensive, and intolerant of temperature variations
  - Excellent opportunity to penetrate the transportation market with our products

*Advanced Automotive Battery global market size : over $1.4B later this decade*

13





14

**LTC Lithium**
Technology Corporation

# Market Feedback – Specific Opportunities

- **Existing Applications**
  - Opportunities for 12-V SLI and Auxiliary Batteries
  - High end automotive [Porsche]
  - Lightweight composite buses [North American Bus Inc]
  - Racing cars and motorcycles
  - Marine applications

- **Developing Applications**
  - Heavy Duty HEVs for Buses, Taxis and Fleets (shorter development time and ideal proving platform for batteries)
  - Mid-size pickup trucks, electric bikes (Military, Law Enforcement), Highway capable EVs
  - HEVs for Automotive OEMs – Long lead time for vehicle development, but sales expected to steadily increase



**LTC Lithium**
Technology Corporation

# Path to Markets

- **LTC sells to OEMs**

  - Design to customer specifications

  - Showcase capabilities and performance of unique large-format flat and cylindrical cells

  - Seed market with prototypes (customers fund R&D and early production)

  - Cover small-volume requirements in-house and through outsourcing

- **LTC establishes relationships with major battery manufacturers**

  - Technology Licensing or JVs

  - To meet mass market OEM requirements

15





## Business Development Summary

16

**Purchase Orders Received**
NASA
Porsche (SLI & Aux)
Daimler Chrysler
Classified UK MoD
Penn State Future Truck
GE (HEV bus)
Wavecrest
Velocity Engineering AG

•**Development Projects**
EU 42 V SLi Battery
BMWA HEV Battery
BMBF Microsolar battery
IQ Wireless
German Submarine
Stage 1 & 2
Boundless
TJ Technologies
12V SLI In-vehicle demonstration
Mountain Power (EV)



**LTC Lithium**
Technology Corporation

## Business Development Summary (2)

17

**Purchase Orders Expected**

Vodafone
USABC (42V)
Deutsche Telecom

**Batteries/Cells Being Tested**

Univ Minn (robotics)
Univ Chicago (balloon)
BMW/ASTOR (42V)
Bosch

**Other Near-Term Opportunities**

DME (flight tester)
CECOM (D cells, LI-7, 2590)
TACOM (SLI, HEV)
Mountain Power (EV)
Thyssen (motor wheelchair)
USGS (remote sensors)
Brentronics (LI7, 2590)
Custom Manu. & Engin.
Tesla
Lyntronics
Powertronics
BAE
United Dynetics
Mesa Power
Phoenix International
Meer



# LTC Lithium Technology Corporation

## Competitors (Rechargeable Batteries)













## National Defense

Saft
Eagle Picher
Yardney
Compact Power/LG

## Stationary Power

Enersys
Valence
Thunder Bi..e Sky (China)   Saft

## Transportation

JCI (Lead acid)
Exide (Lead acid)
(NIMH, Li-Ion)
Panasonic (PEVE) (NIMH)
Compact Power/LG (Li-Ion)
Sanyo (NIMH,Li-Ion)
Delphi (lead acid, Li-Ion)
Trojan (lead acid)
Japan Storage(Lead acid, Li-Ion)

18



Projected Income Statement 2003-2007

19

## Lithium Technology Corporation and Subsidiaries
### Consolidated Profit and Loss Projections
(USD in thousands)

| | | | | | |
|---|---:|---:|---:|---:|---:|
| **REVENUES** | | | | | |
| Product sales and contracts | $ 2,895 | $ 8,099 | $ 17,598 | $ 31,145 | $ 54,528 |
| Cost of goods sold | 1,438 | 3,848 | 8,386 | 14,730 | 26,287 |
| Gross profit | 1,457 | 4,251 | 9,212 | 16,415 | 28,241 |
| *Gross profit margin* | *50%* | *52%* | *52%* | *53%* | *52%* |
| **COSTS AND EXPENSES** | | | | | |
| Research and development | 1,610 | 1,965 | 2,424 | 3,335 | 5,755 |
| General and administration | 4,305 | 4,518 | 4,924 | 6,120 | 10,818 |
| Amortization | 677 | 677 | 677 | 677 | 677 |
| Total operating expenses | 6,592 | 7,160 | 8,025 | 10,132 | 17,250 |
| Operating income | (5,135) | (2,909) | 1,187 | 6,283 | 10,991 |
| Net interest income/(expense) | (387) | (384) | (382) | (381) | (380) |
| Earning before tax | (5,522) | (3,293) | 805 | 5,902 | 10,611 |
| Income Tax | - | - | - | - | - |
| **NET INCOME/(LOSS)** | **$ (5,522)** | **$ (3,293)** | **$ 805** | **$ 5,902** | **$ 10,611** |



**LTC Lithium Technology Corporation**

## Capital Structure

- **OTC Bulletin Board listing (LTHU.OB)**
  - NASDAQ listing anticipated late 2003/early 2004
- **Total Investment in LTC and GAIA to date/$55 Million cash**
  - Lead investor & major shareholder: Arch Hill Capital
- **Board Approved Restructuring**
  - Reverse Split (1 for 20) implemented July 28, 2003
  - Upon close of financing, excess of $24 million in debt will be converted to equity ($7 million debt remaining)
- **Common Stock**
  - Today: 125 million shares authorized; 4 million outstanding; 14 million fully diluted;
  - 9,500 + shareholders of record
  - Post $10 million financing transaction: approximately 50 million shares fully diluted

20



**LTC Lithium**
Technology Corporation

## Timely Investment Opportunity

- **Target markets expanding rapidly**

  – **Growing demand for advanced large-format rechargeable batteries, especially by U.S. Military, will drive near-term revenue and long-term growth**

  – **Lithium-based solutions likely to become technology of choice**

- **Experienced Management Team able to execute**
- **Innovative proprietary products ready for markets now**

  – **Substantial orders being received**

  – **Manufacturing processes and know-how to ramp-up production**

- **Attractive Valuation and Financing Terms**

21

22





- **Series C Convertible Preferred Stock and Warrants**

  - $12,000 per share
  - 8% annual dividend increasing to 12% on July 1, 2004
  - Convertible into common stock at $2.40 per share
  - Series A warrants exercisable at $0.001 per warrant – 100% warrant coverage    Exercisable immediately
  - Series B warrants exercisable at $2.40 per warrant – 50% warrant coverage    5 year warrants
  - Arch Hill to purchase $2.5 million of Series C (convert bridge loans)
  - At closing, Arch Hill to convert its $24 million in loans into equity

# Exhibit F

advocaten notarissen

# Barents & Krans

## FAX

| | | |
|---|---|---|
| Aantal pagina's | : | 1 + 1 |
| Datum | : | 15 augustus 2003 |

Parkstraat 107
Postbus 30428
2500 GK  DEN HAAG

Telefoon  070 - 376 06 06
Telefax  070 - 363 38 30

| | | |
|---|---|---|
| Aan | : | Haliotis Investments S.A. |
| T.a.v. | : | de heer D.J.W. Martin |
| Faxnummer | : | 023 - 539 36 41 |
| Telefoonnummer | : | 023 - 539 36 41 |
| | | |
| Van | : | mr O.W. de Jong |
| Onze ref. | : | JO/RZ/NW 2031405 |
| Betreft | : | Arch Hill Capital N.V. |

Geachte heer Martin,

Hierdoor reageer ik – vertraagd door vakantie van mijn medewerker de heer mr R.J.E. Zwaan en door mijn eigen vakantie – op uw faxberichten van 28 juli jl. (waarop mijn waarnemer – zij het niet inhoudelijk – al reageerde bij fax van 29 juli jl.), 4 augustus jl. en 11 augustus jl. betreffende een aantal nog nader door mijn kantoor uit te werken zaken tussen uw vennootschap en bovengenoemde vennootschap.

1.  Uit de faxbriefovereenkomst van 9 juli jl. blijkt zonneklaar dat de betaling van EUR 3.472.500,– door uw vennootschap niet (zoal bij de eerdere transacties dit jaar) op mijn derdengeldenrekening had moeten worden overgemaakt, doch rechtstreeks op de in die overeenkomst vermelde rekening van bovengenoemde vennootschap. Het feit dat ik de betreffende gelden – na deze toch van uw vennootschap op mijn derdengeldenrekening te hebben ontvangen – aan bovengenoemde vennootschap heb doorgestort is mijns inziens dan ook niet aan te merken als het "vrijgeven" van derdengelden doch als het namens uw vennootschap voldoen aan een op uw vennootschap rustende betalingsverplichting.

2.  In mijn beleving dient mijn kantoor drie sets transactiedocumenten op te stellen:
    a.  de akte van verkoop en levering van het belang van uw vennootschap in de vennootschap: Dome Arch Capital N.V. voor een koopprijs van EUR 5.000.000,–;
    b.  de akte van verkoop en levering van het belang van uw vennootschap in de vennootschap: HILLGATE Properties N.V. voor een koopprijs van EUR 527.500,–; en
    c.  de akte van aankoop en (uit)levering van zoveel certificaten A, betrekking hebbend op de economische eigendom van aandelen Common Stock in de vennootschap: Lithium Technology Corporation, uit te reiken door de stichting: Stichting Gemeenschappelijk Bezit GAIA, als overeenkomen met 85.500.000 aandelen Common Stock in de vennootschap: Lithium Technology Corporation, een en ander voor een totale koopprijs van USD 10.260.000,–.

*Onze aansprakelijkheid is steeds beperkt tot het bedrag dat in het desbetreffende geval onder onze beroepsaansprakelijkheidsverzekering wordt uitbetaald.*

advocaten notarissen

# Barents & Krans

Tevens dienen de door uw vennootschap aan bovengenoemde vennootschap verstrekte pandrechten op de belangen van uw vennootschap in de vennootschap: HILLGATE Properties N.V. te vervallen en dient er nog een verrekeningsdocument te worden opgesteld waarin de diverse geldstromen tegen elkaar worden "weggestreept".

3.  Het opstellen van de hiervoor onder 2.a. en 2.b. bedoelde transactiedocumenten is relatief eenvoudig. Ik streef ernaar u de betreffende concepten eind volgende week te kunnen toezenden.

4.  Het opstellen van de hiervoor onder 2.c. bedoelde set transactiedocumenten is een stuk lastiger. Niet alleen zijn daar meerdere partijen bij betrokken (de certificaathouders Arch Hill Capital N.V. krijgen immers ook certificaten Lithium), bovendien lopen er zowel in Nederland als in Amerika nog inschrijvingen, waarin op uitbreiding van de belangen in Lithium kan worden ingetekend (ik doel hier op de Amerikaanse emissie die door A.C. Wainwright wordt begeleid/verzorgd en op de in Nederland aan certificaathouders Arch Hill Capital N.V. geboden mogelijkheid extra in te schrijven op belangen in Lithium). Beide inschrijvingen lopen nog; pas als beide inschrijvingen zijn gesloten en de definitieve stand bekend is kan ik de onderliggende documentatie (waaronder die voor uw vennootschap) opstellen. Het vervaardigen van de betreffende concepten gaat zeker nog twee à drie weken duren.

5.  Zoals ik telefonisch al aangaf streef ik ernaar de ondertekening van de hiervoor onder 2.a. en 2.b. bedoelde transactiedocumenten (waardoor uw vennootschap haar huidige posities in de vennootschappen: Dome Arch Capital N.V. en HILLGATE Properties N.V. formeel kwijtraakt) in tijd te laten samenvallen met de ondertekening van de hiervoor onder 2.c. bedoelde transactiedocumenten (waardoor uw vennootschap het belang in de vennootschap: Lithium Technology Corporation formeel verwerft).

Ik vertrouw dat uit het vorenstaande blijkt dat mijn kantoor tracht voldoende aandacht te besteden aan de door u uitgesproken zorg.

Hoogachtend,

O.W. de Jong

Onze aansprakelijkheid is steeds beperkt tot het bedrag dat in het desbetreffende geval onder onze beroepsaansprakelijkheidsverzekering wordt uitbetaald.

TRUE TRANSLATION
FROM THE ORIGINAL DUTCH LANGUAGE INTO ENGLISH

[Printed on Barents & Krans stationary]

**FACSIMILE MESSAGE**

**Pages:** 1 + 1

**Date:**   15 August 2003

**To:**    Haliotis Investments S.A.

**Attn:**  Mr D.J.W. Martin

**Fax:**   023 – 5393641

**Telephone:**   023 – 5393641

**Our reference:** JO/RZ/NW 2031405

**Re:**    Arch Hill Capital N.V.

Dear Mr Martin,

Herewith I react, delayed due to the holiday of my associate Mr. R.J.E. Zwaan and my own vacation, to your facsimile messages sent on 28 July (which my substitute reacted on by fax of 29 July, be it not with regard to content), 4 August and 11 August with regard to several outstanding issues between your company and the company mentioned above which are going to be resolved by my office.

1.    It is obvious from the Letter Agreement of 9 July that the payment of EUR 3,472,500 by your company had to be paid directly into the bank account of the above mentioned company and not (as was the case in an earlier transaction this year) on my third party account. The circumstance that I deposited this amount into the bank account of the above mentioned company after having received it on my third party account can not be seen as a release of this amount but as a fulfilment on behalf of your company of an obligation to pay resting on your company.

2.    In my view my office needs to draw up three sets of transaction documents:

a) a deed of sale and transfer of your company's stake in Dome Arch Capital N.V. for a sales price of EUR 5,000,000;

b) a deed of sale and transfer of your company's stake in HILLGATE Properties N.V. for a sales price of EUR 527,500; and

c) a deed of purchase and transfer of as many depository receipts A relating to the beneficial ownership of common stock Lithium Technology Corporation to be issued by the Stichting Gemeenschappelijk Bezit GAIA equivalent to 85,500,000 common stock Lithium Technology Corporation for a purchase price of USD 10,260,000.

**TRUE TRANSLATION**
**FROM THE ORIGINAL DUTCH LANGUAGE INTO ENGLISH**

Furthermore, the pledge granted by your company to the company mentioned above on your interest in Hillgate Properties N.V. needs to be cancelled and a set off document needs to be drawn up sees to the "cancelling out" of the different flow of funds.

3.   The drafting of the documents mentioned under 2.a and 2.b will be relatively easy. I will try to provide you with drafts of these documents by the end of next week.

4.   The drafting of the documents mentioned under 2.c is a lot more difficult. Different parties are involved (the holders of depository receipts Arch Hill Capital N.V. will also get depository receipts Lithium). Furthermore there are subscriptions pending in the Netherlands as well as in the United States for the acquisition of a stake in Lithium (I am referring to the stock issue that is looked after/supervised by A.C. Wainwright and the opportunity that is given to the holders of depository receipts Arch Hill Capital N.V. to additionally subscribe to Lithium participations). Both subscriptions are still pending. When both subscriptions have been closed and the final count is known I can start drafting the underlying documentation (among which those for your company). The drafting of these concepts will take two to three weeks.

5.   As I already pointed out during our telephone conversation I am striving to have the documents mentioned under 2.a. and 2.b. (whereby your company will formally lose its current interests in Dome Arch Capital N.V. and HILLGATE Properties N.V.) signed simultaneously with the signing of the document mentioned under 2.c. (whereby your company will formally acquire an interest in Lithium Technology Corporation).

I trust that the foregoing shows that my firm is trying to give proper attention to the concerns addressed by you.

Kind regards,


O.W. de Jong

≋JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

HALIOTIS INVESTMENTS S.A.

**DEFENDANTS**

ARCH HILL CAPITAL N.V.,
LITHIUM TECHNOLOGY CORP.,
HENDRIKUS HAROLD van ANDEL

**(b)** County of Residence of First Listed Plaintiff  Luxembourg entity
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
see attachment

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                     and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):  15 U.S.C. § 78j

Brief description of cause:  Violation of 10b-5 of the Securities Exchange Act, common law fraud, and fiduciary duties

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $
9,000,000 Euros

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):      JUDGE                                    DOCKET NUMBER

DATE
11/3/06

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

Attachment to Civil Cover Sheet

I.(c)  Attorney's (Firm Name, Address, and Telephone Number)

J. Travis Laster (#3514)
Abrams & Laster LLP
Brandywine Plaza West
1521 Concord Pike, Suite 303
Wilmington, Delaware  19803
(302) 778-1000

Matthew F. Davis (#4696)
Abrams & Laster LLP
Brandywine Plaza West
1521 Concord Pike, Suite 303
Wilmington, Delaware  19803
(302) 778-1000

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ___0 6 - 6 7 9___

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____3_____ COPIES OF AO FORM 85.

___11/3/06___
(Date forms issued)

_____
(Signature of Party or their Representative)

___Anthony Giobbe___
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action